FEDERAL COMPRESS & WAREHOUSE COMPANY *v.* HARMON.

4-5114

Opinion delivered June 13, 1938.

*Buzbee, Harrison, Buzbee & Wright,* for appellant.

*Sam T. Poe, Tom Poe* and *C. E. Johnson,* for appellee.

HUMPHREYS, J. This is an appeal from a judgment in the sum of $1,500 rendered on a verdict against appellant in favor of appellee in the circuit court of Pulaski county for personal injuries appellee suffered while he was employed as a reefer about a cotton bale press at Ashdown, Arkansas, in October, 1936, through appellant's negligence in permitting hooks to accumulate on the tramway or passageway from the dinky press to the large press so that one or more hooks became entangled in the bagging of a bale of cotton on its way from the dinky press to the large press, which caught in the cuff of appellee's pants while engaged in his duties, and unbalanced him to such an extent that his hand was caught in the bale of cotton and injured.

Appellant's only contention for a reversal of the judgment is that according to the undisputed evidence the presence of the hooks and the likelihood of them becoming entangled in the bagging of the bale of cotton on its way from the dinky press to the large press was known to appellee before the accident occurred, and that the danger was fully appreciated by him and, therefore, the risk was assumed.

One of the defenses interposed by appellant was appellee's assumption of the risk incident to his employment.

Appellant argues and contends that viewed in the light of appellee's own testimony appellee assumed the risk of the employment as a matter of law, and that the trial court erred in not instructing a verdict for it. In view of this contention the testimony of appellee in its entirety relative to his employment, the conditions exist-

ing in and about his working place and the manner in which he received his injury is set out herein, and is as follows: "Q. How old were you in October of 1936? A. Thirty-nine. Q. When were you 39. A. 18th of October. Q. You are the plaintiff in this case are you? A. Yes, sir. Q. How long have you lived in Ashdown? A. I have lived in Ashdown since I was eight years old, thirty-one years. Q. Now, where were you working when you were injured? A. At the Federal Compress Company, Ashdown, Arkansas. Q. Had you worked there before that time, Clyde? A. Yes, sir. Q. What kind of work were you doing when you were injured? A. I was reefing bands that is shoving them through. Q. At the big press? A. I was. Q. You don't work there all the year do you? A. No, sir, just during the cotton season. . . . Q. Now then what time of day was it that you got hurt down there, Clyde? A. It was 10:30. Q. What month was it in? A. October. Q. What day? A. The 23rd seems to me. Q. What year? A. 1936. Q. Now, tell the jury just what the condition was there at the press at the time you got yourself hurt, what had happened just before you got hurt and tell them how you got hurt there. A. Well, before I got hurt we have orders from the superintendent to hold the cotton up erect. Q. Where? A. In the press. Q. In the big press? A. Yes, sir. Q. For what purpose does it have to be held erect? A. When it starts the bale up if the sides begin to bulge it makes a great big bale. Q. You don't want that kind of bale? A. We have orders not to put out any of that kind that throws us to have to straighten it up and kick it with our knee, hands or feet any way to get it up we use our feet because some times your hand catches in the bale or your sleeve on some metal. At the time I got hurt we had one that started it it seemed to bulge. Q. Where? A. Onto my side just at one end. Q. What did you do? A. I taken the bar up over me where we hold to balance ourselves to keep from falling and kick onto it and as the pressure started on it seemed to bulge and I kicked it and tried to release my foot and the hook caught in my trouser

and the press was going up in motion then. Q. What effect did that have when the hook caught your trousers? A. It was going up and that carried my foot this way into the bale and got me overbalanced and I was holding both hands and kicking after it carried my foot up I tried to pull back and that throwed me to miss catching my hand right about twelve inches from the top of the bale my hand being that was caused by thumb not to go any further there was no injury on this thumb that throwed me to injure my hand. Q. All the four fingers except the thumb? A. Yes sir. Q. All the four fingers caught in the bale? A. Yes, sir. Q. Did the press continue to go on up? A. Yes, sir. My thumb was in this shape. It was only about a three hundred pound bale and my thumb being this way just like a fender it didn't get into the bale. Q. Did that bale, when brought to the big press, have any metal hooks on it? A. Yes. Q. How many, four? A. Yes, sir, four. Q. Did you remove the one on your side? A. Yes, sir, they were all out. Q. Were you working pretty fast there? A. Yes, sir. Q. Did you know it had a hook in the bagging that caught your trouser leg? A. No, sir. Q. Where was that hook? A. It was underneath the bagging. The bagging sometimes sweep the floor and the trucker passed over it sweeps it up and it was pushed under there, it looked to me like there were three or four there. Q. That hook caught in your trouser leg, the hook underneath the bagging and pulled your knee into the bale and in trying to extricate your knee you got your hand caught in the bale? A. Yes, sir. Q. Now, Clyde, what was the next thing that was done after you got your hand caught in there, did you give an outcry? A. Yes, sir, I was hollering. Q. What did they do then with the steam pressure on the big press? A. He released it. Q. And what condition was your hand in then? A. This hand was just flat. They told me to go put some coal oil on it and I told them I couldn't put coal oil on it because the bones were out. Q. Did your hand bleed there at the compress? A. Yes, sir. Q. What about the bones? A. This here one here was out this way

they asked me if it was cut and I told them I couldn't tell I couldn't move it. . . . Q. Now how many of you were there working at the big press when you got hurt? A. Eight. Q. Three of you on either side and a sewer on each end? A. Around the press, yes, sir. Q. Any white men working at the big press? A. No, sir, there wasn't any white men. Q. Of course you had—Tell the jury from whom you received instruction to kick the bale as you did when you got injured? A. We received instructions to kick the bale of cotton to make it press out a perfect bale by the superintendent. Q. Mr. Choate, here? A. Yes, sir. Q. What was the condition of the big press at the time you got hurt that day? A. The condition of the big press, we were instructed not to lean over under it or anything because there was only one bolt at the end holding this top. A. The other end was not fastened? A. It would move backwards and forth whenever the bale got up to it it would drop. Q. What effect did that have on compressing of the bale as to bulging or rolling in the press? A. Well, it would cause some bales to come over farther and it would not come up as far by this bottom being bursted it would come out two inches that throwed it out of balance like catching over here and it would give it more pressure on this side. Q. Had there been anything said about fixing that before you got hurt? A. Yes, sir. Q. What had been said about it? A. He said they—Q. Who is he? A. Mr. Choate, the superintendent, he said he was going to have that fixed just the week before this happened and one of the head sewers on the south end, Alfonso, had suggested the part up over head was broke, I don't know the name of it, however, when the press was moving it looked like it would break and fall and he jumped and run out. Q. Was there a mechanic there to fix it? A. No, sir. Q. Was he waiting for one to come and fix it? A. He was with the company somewhere. Q. Did you know this hook was in the bottom of that bale? A. No, sir. Q. Was it at a place where you could see it? A. No, sir. . . ."

CROSS-EXAMINATION

"Q. Clyde, how long had you been working at the compress as a reefer, I don't mean that particular year, I mean how many years? A. Off and on seventeen years. Q. Most of the time reefing? A. Yes, sir. Q. The kind of work you were doing when you got hurt? A. Yes, sir. Q. By off and on you mean through the compressing season? A. Yes, sir. Q. And you worked practically every season? A. I lost two seasons in all. Q. Outside of that, every season for fifteen years, you have worked at that kind of work? A. Yes, sir. Q. Now, you said your instructions were to keep the cotton from bulging out at the side so as to make the bale flat? A. Yes, sir. Q. And to avoid this bulging you would push some of the bales up with your knee or foot? A. Yes, sir. Q. Was the top of the compress higher than your head? A. About even with my head. Q. Something like that? A. Yes, sir. Q. Now, you say on this occasion, when you got hurt, they had pushed a bale of cotton on the compress as usual? A. Yes. Q. What caused it to bulge? A. I don't know. Sometimes the bale is not perfect sometimes there is more cotton on one side. Q. The reason it bulges is when it begins to compress it there is more cotton on one side than on the other? A. Yes, sir. Q. When it starts to bulging out here is because the bottom platter is pushing the cotton up against the top platter? A. Yes, sir. Q. That is what was occurring when you took hold of the rod to push it back? A. Yes, sir. Q. Show the jury again when that bulge started just what you did. A. When it started up, as I said, it was going to bulge then I began to kick it or place this foot against it to kick it just where it begins to bulge out that was all I intended to do and let my foot down. Q. Where was your hand? A. Up here. Q. A hold of that bar? A. Yes, sir. Q. You didn't do that until you saw it start to bulge? A. No, sir. Q. When it started to bulge you caught hold of this bar? A. Yes, sir, and was kicking that with my foot. Q. It continued to come on up pressing the cotton? A. Yes, sir. Q. Now, how long had you been doing that

before this hook caught in your pants leg? A. Seventeen years. Q. I am talking about this time? A. Just a second. Q. Then there isn't much time for it to come up there? A. No, sir. Q. Just as soon as they give the signal to the lever man they start the cotton to pressing? A. Yes. Q. You didn't do anything about it except get your hook off until they gave the signal to the lever man did you? A. You can't. Q. You can't get this hook loose on your side until it begins to squeeze the cotton? A. You can by keeping working just the minute the pressure comes on that gives it release. Q. You were getting out about a bale of cotton—how long did it take you to get a bale out—you were getting out sixty or seventy-five an hour? A. More than that, two a minute part of that time. Q. All right. As soon as they dump that cotton in there and somebody give the lever man a signal—A. Yes. Q. What do you do then? A. The head tyer give the signal. Q. Then when he gets the signal he starts the compress? A. Yes, sir. Q. Then when it begins to squeeze a little that is when you take the hook out? A. It releases it and gives you more slack. Q. This part up here is stationary? A. Yes, sir. Q. And the floor or bottom on which the bale is resting is pushing the bale of cotton against this? A. Yes, sir. Q. And then you take the hook lose? A. Yes, sir. Q. Then you throw it back to one side? A. Yes, sir. Q. In the meantime this is coming on up? A. Yes, sir. Q. You noticed that it was bulging over here? A. Yes, sir. Q. You catch hold of the bar and push it in? A. Yes, sir. Q. And it is still coming up pressing the cotton? A. Yes, sir. Q. What side of the press were you on, on your right-hand side or left-hand side? A. I was facing this way on the right-hand side. Q. Suppose this is the press? A. I was on this side. Q. Where I am standing? A. Yes. Q. We will say this is the press. Now the top of the press would strike you right along here about where the neck joins the shoulder? A. Yes, sir. Q. When the bale is being pushed up against the press the top of the bale would be about neck high or shoulder high to you? A. Yes. Q. The bar

you catch hold of is about even with your head? A. Yes, sir. Q. It is closed over on this side, are the ends open? A. It is open all round. Q. There is a metal band here? A. No, sir. Q. How is the top supported? A. There are four posts. Q. Except for the posts it is open? A. Yes, sir. Q. Is there a post at your corner? A. Yes, sir, one there. Q. Now when you are standing here there is a post out here at your end or corner of the compress? A. Yes, sir. Q. Of course in between the post at your end and the post at the opposite end is the place where the sewers can get at the bale and sew the ends of the bagging? A. Yes, sir. Q. Now, where was the hook that caught your pants when you saw it? A. I don't know where it was at. Q. You saw the hook? A. I didn't see it until it was in my pants. Q. When you looked down you were pulling on your pants leg it was pulling your leg up? A. Yes. Q. You were in this position, the bale of cotton out here in front of you and the hook caught in your pants in your right leg here and began pulling you up that way, then did you see the hook? A. Yes, sir. Q. You didn't see where the hook was caught in the bagging? A. I couldn't see, I could see it was caught under the bale like something would be under this paper. Q. Was it a hook like this? A. That was the kind of hook it was. Q. That is the general type you were using there? A. That is the kind we used. Q. Had you taken your hook off? A. I had taken this off of the side. Q. You say this hook was somewhere down there in the bale where you couldn't see it and it caught in your trousers in coming up? A. Yes. Q. What part of your trousers did it catch? A. The cuff. Q. It would be this bottom end caught the cuff of your trousers? A. Yes, sir. Q. Now, then show the jury—you might stand about where you were maybe this is higher, now using this I wish you would stand here at this corner and let this represent the place you were working this is the press, show the jury how you were caught? A. I was kicking on the bale at the front end and had done kicked it to straighten it and I was taking my foot down and just as it started up it

caught me by the pants causing me to overbalance and I throwed my hand in this position up to here my thumb was kind of a fender kept it from going farther in. Q. Your hand didn't get on top of the bale? A. No, sir. Q. It came between the top of the press and the bale? A. It came in about twelve inches of loose cotton. Q. Your hand caught in the loose cotton? A. Yes. Q. It didn't get caught between the top of the bale and the top platter? A. No, sir. Q. You say your thumb didn't go into it? A. No, sir, I had my hand in this position that is why the thumb couldn't get any further in. Q. Your whole hand was in it except the thumb? A. Yes, sir. Q. Did your palm go in too? A. Went in in this position. Q. Of course it was buried about that far in the bale? A. Yes, but what saved my hand was my thumb having it stretched out this way and the fingers went inside further than the thumb that is the reason the thumb didn't get no injury it didn't go far enough into the bale. Q. You couldn't have got your hand in here between the top of the bale and the top platter after the cotton started up? A. No, sir. Q. By the time you took the hook off this pressing against the top platter? A. Yes. Q. You couldn't if you had tried, put your hand in between this top platter and the bale of cotton? A. No, sir, couldn't do that. Q. Now, you say you saw this hook lying there? A. Yes. Q. Who threw that there? A. Different ones drop them some times you can have a hook break and when they break they always fly. Q. When you took it off what did you do with yours? A. We throw it out to one side from the runway. Q. Are you supposed to throw it back toward the dinky? A. Yes, sir. Q. They were then up at the dinky where they can use them? A. Yes, sir. Q. So what you intend to do is throw your hooks back to the dinky? A. We throw them there. Q. You said you noticed two or three hooks lying there just before the accident happened? A. Yes, sir, I noticed them laying all over there they are all over the press room. Q. How long did you notice them? A. Continually all the time. Q. They are there all the time? A. I don't

know about all the time they were that morning. Q. This accident happened at ten o'clock? A. Yes, sir. Q. When did you notice them? A. Well, I notice them continually all the time when they begin to crowd us at the press we wouldn't have time to stoop down and get them we would take our feet and kick them out that is why we could notice so many of them we didn't have time to stoop over and shove them out we kicked them out with our feet. Q. Did you want to get them out of the way? A. We kept them out as best we could. Q. Why did you want to keep them out of the way? A. Well, they catch in the bales of cotton some times they catch on the bagging and come by and catch our trousers it is dangerous. Q. That is the reason you want to keep them away? A. Yes, sir. Q. Now you speak of that top part, the top platter, you said it was not bolted down tight? A. It wasn't at the present time. Q. What part was not? A. The north end. Q. Which end did you work on? A. The south end. Q. You mean the top opposite you was not tight? A. It wasn't tight and the bottom on my side was bursted and the top was loose. Q. Do you mean a piece broken out? A. Yes, sir, about a half inch we couldn't hardly shove a bale in it was opposite where it ought to be about half an inch out this way it was broke up and down. Q. Do you mean that thing the cotton was resting on—the floor? A. It was broke lengthwise the bale caught it up and down this way it was broke up and down this way the platter part goes up this way and it was broke across. Q. Do you mean a piece was broken plumb out? A. No, sir, just broke. Q. You mean cracked? A. It was cracked open you could get your hand down between the crack. Q. That was a crack in the floor lengthwise? A. Yes, sir, of the platter. Q. Over here how much play would you say this had where it was not bolted tight? A. It would have near about an inch when you release off the cotton and when you turned the press on it would mash up in place when you come down it come down. Q. How much play would you have when compressing cotton how far would the cotton come up? A. I would say about half

an inch or an inch. Q. In pressing cotton that pushed this up about an inch? A. About half an inch. Q. It wouldn't press up on your side? A. It would press all along, but when you loosen it, it would drop and was hanging down from the north end. Q. What do you mean? A. It was off the platter. It is bolted on the beam. Q. You said it was bolted tight at your corner? A. It wasn't bolted all the way around, there was two bolts at my end. Q. Bolted tight all the way around over on this side it had one bolt on your end, it had two bolts? A. Two at my end. Q. Was it bolted across here? A. They had lag screws or machine bolts in it. Q. They had two bolts here and one bolt here? A. Yes. Q. That is where it would get its play? A. Yes, sir. Q. It didn't have any play at your end? A. It didn't have very much it would move all the time whenever the cotton hit it. Q. How long had that been that way? A. I don't know, sir. Q. Had it been that way all that week? A. It may have been that way all the season up until I got hurt. Q. You never said anything about having it fixed until the week before you got hurt? A. I never did hear anything about repairing it at all. Q. I thought you said the superintendent said something about it? A. He did. One of the boys working on the end or the side I was on, there was a bolt right up over his head got out and he said he was going to quit he got excited or afraid of it and he told him to go ahead he would fix that. Q. What part was that? A. That was up over the large beam look like it was near the cylinders. Q. That part didn't have anything to do with your accident? A. I don't know, sir. Q. At any rate that wasn't a thing that you had complained about? A. It wasn't exactly anything I was complaining about I don't know what effect it would have down there. Q. Now then when the superintendent said something about having it fixed he was talking about fixing something up above in the machinery? A. That what he was talking about having fixed. Q. You hadn't said anything to him or he to you about fixing this loose place down here or that crack in the bottom had you? A. Well, no, sir,

I didn't think that was my job. Q. Your job was reefing? A. Yes. Q. Nothing had been said by you or the superintendent about that? A. No, sir. Q. So what you are talking about his promise to fix something that is what he said to that boy about that place up above the compress? A. He said he was going to have the press fixed I don't know whether it was that head or the other part. Q. You say this condition had been there all the season? A. Yes. Q. Had it been there the season before? A. I don't know. Q. You worked there the season before? A. Yes, sir. Q. You don't know what the condition was then? A. I think it was broke the last part of the season last year. Q. You do know it was there when you started work last year? A. Yes, sir. Q. When you first started work you knew that condition was there? A. Yes. Q. You went on working there? A. I didn't know the danger. Q. Now then that thing wasn't what caused you to get your hand in the press, all that did was to make the cotton more inclined to roll or bulge? A. That is all that I know of. Q. That wouldn't have a thing in the world to do with your getting hooks hung in your pants or falling into the compress? A. No, sir, it didn't have anything particularly. Q. You thought that would make the cotton bulge more than if that condition did not exist? A. Yes, sir, it would. Q. Otherwise it didn't make any difference? A. No, sir, it didn't make any difference because the bolt that was holding that top part never did break out; if it had gone on and fell on some one it would have killed them. . . ."

REDIRECT EXAMINATION

"Q. Clyde, who is the man on the big press who gives the signal to the man operating the lever which controls the steam power? A. The head tyer. Q. What was his name? A. Simon Tuggle. Q. This hook that you say got caught in your pants leg was it under the bale? A. Between the bale and the press. Q. Had you put it there? A. I never seen it. Q. Now these hooks when you take them out where you stand you say you throw them back in a pile by the dinky press. A.

Yes, sir. Q. Did you throw any hook in the runway between the dinky and the big press? A. No, sir. Q. Did they have other men working in the warehouse besides you men? A. Yes. Q. Several? A. Yes. Q. They worked that day while you were running the big press? A. Yes, sir. Q. And this runway between the dinky press and the big press is where they bring this bale of cotton after the band or ties are taken from it down to the big press? A. Yes. Q. Now that runway, did you see that hook in that runway after you got hurt? A. Yes, sir. Q. And not before? Mr. Harrison: He knows his witness testified he saw it before. Mr. Poe: I will withdraw it. Mr. Harrison: That is putting the answer in the witness' mouth. Q. You saw the hook in the runway after you got hurt? A. Yes, sir. Q. Now this pile that you say accumulated by the big press, were there some by the big press? A. No, sir. Q. The pile was over near the dinky press? A. Yes, sir. Q. Working as you were, did you have time to stop and go out into the warehouse in the runway and pick up these hooks and throw them out? A. No, sir. Q. Were there any other men in the warehouse or compress who could have done that work? A. No, sir, we didn't have enough men to. Q. That is right around the big press? A. No, sir. Q. Do you know some of the boys working in the warehouse there? A. Well, some of them. Q. Since you had eight men at the press, nine men including the lever man—A. Yes, sir. Q. How many at the dinky press? A. Four. Q. Thirteen in all? A. Yes, sir. Q. How many men run the trucks? A. I don't know, there was about forty I reckon in all. Q. Forty working in the warehouse? A. Maybe more. Q. Well, were any of them doing any faster work or higher speed than you men at the big press? A. No, sir, that is the fastest they have. Q. How many big presses do they have in that warehouse? A. One. Q. Was Mr. Choate, the superintendent, in and about the compress around the big press and dinky press at various times? A. Yes, sir. Q. Did he have assistants who were in and out during the day? A. Yes, sir. Q. What was his as-

sistant's name? A. Phillips. Q. Did they have any more white men in and around there? A. No, sir. Q. Now this post that was at the end of the press, the big press where you worked when the bale got in the press it had to go in between those posts? A. Yes, sir. Q. There is plenty of room isn't there between the post where the bale had to go for a bale to clear that. How much space is there between the bale and the post? A. There was a lever post which operated the machinery, which post do you want? Q. The two big posts that held up the press, how much distance between the end of the bale and the post on that end? A. They are twelve or fourteen feet apart. Q. Plenty of room? A. Yes, sir. Q. Now, you said the north end of the top platter was not bolted? A. No, sir. Q. Where was Alphonso working when he got excited? A. At the south end. Q. Down at the south end where you were working? A. Yes, sir. Q. What was it Alphonso got excited about if you know, do you know exactly? A. It was part of the press, what hold the jacket it was bolted and the bolt holding the top of the press up it would spread open, that is it was shaking he looked up and saw that and run out from under it. Q. Was that the head block of the press? A. That was the frame. Q. That was up above the platter? A. Yes, sir. Q. At the same time was the top platter not bolted securely? A. Yes, sir. Q. Was the press if you compress a bale of cotton was it shaking or rattling, was there a rattle? A. It wasn't rattling he looked up and seen it moving. Q. Was the lower platter cracked near the south end? A. Yes, sir. Q. You say the superintendent, in your presence, told this Alphonso that 'I am going to have that press fixed?' A. Yes, sir. Q. Were those the words he used? A. Yes, sir. Q. Did you understand by that that when the machinist come to fix that part that the other two places would be fixed? A. Yes, sir. Q. You continued to work relying upon that belief? A. Yes, sir. Q. Now, did you realize the danger, by reason of the crack in the lower platter and the failure to fasten the north end of the press, to you?

A. Yes, sir. Q. Did you realize that could cause you to get hurt in the way you got hurt? A. I wouldn't have to kick it so much. Q. Did you give it a thought that that condition could cause you to get hurt in the manner you did get hurt before you got hurt? A. Yes, sir. Q. But that didn't cause you to get hurt? A. No, sir. Q. The thing that caused you to get hurt immediately was the catching of the hook in your trouser leg pulling your knee into the press? A. Yes, sir. Q. You did not see it until it caught in your pants leg? A. No, sir. Q. As it was impossible to see it because it was on the bottom of the bales? A. Yes, sir. . . ."

### RE-CROSS EXAMINATION

"Q. Now I believe you have been working there seventeen years doing that kind of work? A. Off and on. Q. Off and on, you work there during the season? A. Yes, sir. Q. When the season is over you do other kinds of work? A. Yes. Q. As I understand you the reason for having to kick the bale to keep the cotton pushed back was to keep the bale from turning flat, is that right? A. Yes. Q. That has been going on all those years you have been working there? A. Yes, sir. Q. You have been pushing cotton back just like you did this day, you got hurt? A. Yes, sir. Q. The only difference you got a hook in your pants on this day? A. Yes, sir."

We do not find anything in appellees evidence tending to show that he knew, or, in the exercise of ordinary care for his own safety, could have discovered, that the hook which caused his injury was entangled in the bagging of the bale of cotton that was being compressed at the time he was hurt. His testimony shows that he did not know the hook was entangled in the bagging of the bale of cotton until it caught his pants leg. His testimony shows that the hook was caught under the bottom of the bale between the bagging and the cotton, and that he could not see it and his testimony further shows that his work engaged his undivided attention. Bales of cotton that he had to handle with the aid of his fellow-servants passed through the press about every half minute

and in handling the bales properly his undivided attention was required. It shows that neither he nor any of his fellow-servants had time to make any examination of the bale of cotton as it passed through the press to ascertain whether it had picked up a loose hook off of the tramway or passageway and if they had had time to look they could not have seen it because it was caught in the bagging under the bottom of the bale. It was not an open and obvious danger in the manner in which it was caught in the bale of cotton.

This court said in the case of *Aluminum Company of North America* v. *Ramsey*, 89 Ark. 522, 117 S. W. 568, that (quoting syllabus 6): "It is improper to instruct the jury that a certain fact or group of facts amounts to negligence *per se*, unless such acts are declared by law to be negligence *per se*, or are such as to induce an inference of negligence in all reasonable minds."

This declaration of law has been adhered to by this court since the time that opinion was handed down on March 1, 1909, by Mr. Justice HART, who afterwards became Chief Justice of this court. In that case the following excerpt found in 26 Cyc. 1233 was indorsed by this court which is as follows: "Unless the danger is actually known to the servant, or is so obvious and imminent that an ordinarily prudent person would refuse to incur it, he had the right to rely upon the performance by the master or his authorized agents, other than his own fellow-servants, of the duties imposed upon the master by law for the protection of his servants."

The law of assumed risks by a servant is well and amply stated in the case of *Seaman-Dunning Corp.* v. *Haralson*, 182 Ark. 93, 29 S. W. 2d 1085, found in syllabi 1, 2 and 3, and is as follows: "1. MASTER AND SERVANT —ASSUMED RISKS.—While a servant assumes the ordinary and usual risks of the negligence of his employment, he does not assume the risk of negligence of his master or of a fellow-servant.

"2. MASTER AND SERVANT—ASSUMED RISK.—The doctrine of assumed risk, while, applicable in cases fairly within the rule, is not a favored doctrine and should not be extended beyond its reasonable limits.

"3. MASTER AND SERVANT—ASSUMED RISK—QUESTION FOR JURY.—Whether a servant knew and appreciated a certain danger, or ought to have known of it so as to be chargeable with assumption of the risk thereof, is a question for the jury unless the evidence warrants but a single reasonable inference of such fact."

We find a clear and concise statement in the case of *Choctaw, Oklahoma & Gulf Railroad Co.* v. *Jones*, 77 Ark. 367, 92 S. W. 244, 4 L. R. A., N. S. 837, 7 Ann. Cas. 430, relative to the assumption of risks by employees and adopt it as the test applicable to the facts in the instant case: "The mere fact that a servant, exposed while at work to extraordinary peril by the master's negligence, knew of the latter's negligence and continued his work without objection does not establish that the servant assumed the increased risk; it must be shown, not only that the servant was aware of the negligence, but that he also realized the danger to which he was thereby exposed."

Viewing appellee's testimony as a whole we are unable to say as a matter of law that he realized the danger to which he was exposed although he did have knowledge that hooks were stacked in the vicinity of the dinky press and sometimes were thrown or kicked on the tramway or passageway from the dinky press to the large press. We have concluded that the issue of assumed risk was one for determination by the jury, and, since the jury has found under proper instructions that appellant did not appreciate the danger to which he was exposed, appellant is bound by the finding of the jury.

No error appearing, the judgment is affirmed.

BAKER, J., concurs.

SMITH and DONHAM, JJ., dissent.