ALUMINUM ORE COMPANY *v.* GEORGE.

4-7563                                      186 S. W. 2d 656

Opinion delivered April 2, 1945.

*W. R. Donham, J. W. Barron* and *S. Hubert Mayes,* for appellant.

*Eugene Coffelt, Kenneth C. Coffelt* and *Wm. J. Kirby,* for appellee.

GRIFFIN SMITH, Chief Justice. Appeal is from judgment on a jury's verdict finding that Bert A. George sustained pulmonary disability while working for Chicago Bridge and Iron Company on premises provided by Aluminum Ore Company near Benton.[1] To reverse the awarding of $40,000 appellants contend (a) that the Ore Company owed no affirmative duty to an employe of Chicago Bridge and Iron Company; (b) appellee assumed the risk; (c) proximate cause of the injury was not an event or incident set in motion or released by appellants; (d) defendants were prejudiced by plaintiff's act in excusing certain jurors; (e) erroneous instructions were given; (f) improper argument was made to the jury, and (g) the verdict is excessive.

※　※　※　※

Defense Plant Corporation, a federal agency, owns the alumina plant. Aluminum Company of America contracted with Defense Plant Corporation to do structural work near Bauxite. Aluminum Ore Company—an entity

---

[1] Wallace Whitson, one of the two appellants here, was Aluminum Ore Company's agent, supervising operations at the plant where George says he acquired the irritation.

distinguishable from Aluminum Company of America—directed operation of the alumina plant. Perpendicular steel tanks seventy by twenty-four feet, called precipitators, were set eleven feet apart. The Bridge Company's initial contract was for eighty-eight tanks. Subsequently twenty-four more were ordered, and a later requisition called for nineteen, making a total of 131.

These tanks had conical bottoms, but the opposite end was open. Around each, approximately four feet from the top, there is a steel floor supported by structural irons, with brackets attached to the tank. Between the floor and tank there are openings, varying from two-and-a-half to seven inches, the greater spacing being at the point of joinder of twelve segments which extend around the container. The smaller opening is at the center of each segment nearest contour of the tank.

Into these tanks a mineral emulsion was pumped, the principle component being bauxite or a derivative. To prevent premature precipitation of solid matter, which would naturally settle to the bottom, air under pressure of something less than 100 pounds was forced into the liquid as containers were being filled. Convulsions caused by agitation of the fluid produced foam, specific gravity and consistency being such that it was forced to the surface. Under certain conditions—influenced by air pressure and the level within the container—the mixture would overflow. This excess would ordinarily escape down the tank wall past the opening provided for that purpose; but at times it would spread to the steel platform flooring and solidify.

The primary company's completed plans called for walkway connection between all of the tanks, so that a person ascending by an elevator placed between the first and fourth tanks might pass from one position to another over the entire available area of 161,700 square feet.

For several years George had been employed by Chicago Bridge on structural work. In March, 1942, he came to Arkansas in line of duty. With certain unimportant variations in the character of services performed he con-

tinued with Chicago Bridge as a riveter until June, 1943, under an arrangement creating the relationship of master and servant. By August more than half of the first group of eighty-eight tanks had been constructed to a point of serviceability. Due to war needs and pressure of time, some of the tanks were pressed into service before walkways connecting individual units were completed.

George concedes that his relationship with appellant (Aluminum Ore Company—hereafter referred to as Company) was not contractual, but denies that Chicago Bridge was in exclusive control of the premises.

We think there was substantial evidence showing that while Chicago Bridge had certain unfinished work to do, the Company intervened in a physical sense to the extent of placing tanks in operation as rapidly as they became serviceable, and in doing so its activities caused the overflow complained of, with subsequent crystallization, or pulverization when George and the crews with which he worked activated the deposit while pursuing the assigned task.

It is in evidence that on one occasion these employes complained to Superintendent Mooney of Chicago Bridge. Together they went to Wallace Whitson (one of the appellants here) who directed a Negro and a white man to clean the premises. George says that thereafter he relied upon Whitson's promise to keep the work area in better condition. This protest was made seven or eight months after George went to work. The record indicates he was on duty incidental to flooring platforms approximately 145 days after the precipitators were placed in use, or partial use.

In determining what duty appellants owed an employe of Chicago Bridge — an independent contractor [2]—it is essential that we examine the conduct of

[2] The term "independent contractor" is not used to indicate our determination that after the relationship of employer and contractor had, *prima facie*, been created, conduct of the employer was not such that, in certain circumstances, liability could nor would not have arisen because of interference, or by reason of directions in respect of the manner and means to be employed in reaching the result.

Aluminum Ore Company and its relation to George as a matter of law, essential facts not being in dispute.

In utilizing precipitators before connecting platforms had been completed, with knowledge that construction work would continue, and with the implied direction that it should continue, the Company consented that such employes as were necessary to complete the primary contract should utilize the premises. Even further. To the extent of necessity and convenience in connection with the unfinished task, the men were invited to do the work. But there are substantive differences between the duty due a servant of one independently engaged to produce a certain result through means and methods of his own, and the duty due the servant of a master who directs physical activities, supplies the tools, machinery, or appliances, tells the servant when, where, and how such appliances are to be utilized, and impliedly gives the assurance that the premises are reasonably safe—or, if not safe, warns of danger.

To whom does the employe look for directions, and upon whom does he rely? The answer is twofold: he trusts the one who engages his services, (unless such employe's own information is superior to that of the master) and he has a right to believe that the master, as an ordinary, prudent person, has made inspection where the enjoined duty of care requires that course. But in addition, the employe has a right to assume that where an independent contractor is working on premises provided by that contractor's employer, the employer will exercise ordinary care to see that unnecessary harm does not befall a laborer or anyone who comes upon the property for a purpose connected with the work that is being done or to transact business with the primary employer.

Our decisions are that a business or enterprise operating in circumstances where people are invited to deal with it and to enter in furtherance of business intercourse, owes to the public a duty of care; and this duty is not abrogated or affected by the fact that at a particular time repairs are being made under an arrange-

ment delegating the means and methods to an independent contractor.

A text writer for Corpus Juris, v. 39, p. 1345, states the prevailing rule to be that one who is having work done on his premises by an independent contractor is under the obligation to use ordinary care to keep the premises in a reasonably safe condition for the servants of the contractor, especially where the work is of an exceptionally dangerous character. Somewhat to the same effect, but expressed with more reservation, is the summation in American Jurisprudence, v. 35, p. 590. Where premises on which stipulated work is executed remain under control of the principal employer while the contract is in the course of performance, a servant of the contractor is in the position of an invitee, and as such is entitled to recover for any injury which he may sustain by reason of the abnormally dangerous condition of the premises or plant thereon, if the evidence shows that the principal employer was, and the servant was not, chargeable with knowledge, actual or constructive, of the existence of that condition. There is this subjoined statement:

"In amplification of this rule it may be said that where any person is brought upon premises belonging to the individual charged with negligence, there is a duty to inform the person who is brought upon the premises of anything in the nature of a trap from which he may suffer. The principal employer has been said to be bound in law to use reasonable care and caution to provide and maintain a safe place in which the servants of the independent contractor can work, although not bound absolutely to provide and maintain such a place; the duty is fulfilled if reasonable care is used to protect the plaintiff from injury, in supplying and maintaining a safe place. . . ." See 44 A. L. R., p. 932, et seq.

Conceding, in respect of the general purposes of construction, that George was impliedly invited by the Company to continue working after the tanks were put into operation, and that the Company owed such employes of its independent contractor the duty of ordinary care, answer must be found to the question, What was ordi-

nary care in view of the servant's experience, character of the work, the manner in which it was being done, interference of the Company, danger inhering in the operation, and the master's familiarity with conditions as distinguished from ability of the servant to apprehend and appreciate the risk?

The Company contends—and there is no substantial testimony to the contrary—that it did not know injurious results might reasonably be expected to attend inhalation of dust created when workmen agitated the dried deposit which had formerly been emulsion, composed of water, lime, soda ash, and bauxite. No other claims were made, either at the plant in question, or elsewhere. Plaintiff's allegation was that he contracted silicosis, bronchitis, bronchiolitis, and acquired a thickened pleura over the upper portion of the right lung, and is thereby permanently disabled.

Principal effort at trial was directed to the task of proving silicosis. The chief witness was Dr. J. D. Riley, who was not certain. Dr. Riley made several examinations, both subjective and objective. His conclusions may be summed up in this statement, made in response to the question, "Did the patient have true silicosis?" Answer: "I cannot say he had. I can only say that this X-ray picture may or may not be due to the inhalation of silica. The X-ray picture is comparable with the diagnosis of silicosis, but the shadow on the X-ray could be caused by the inhalation of some other irritating substance."

Appellee testified that the dust was irritating and sometimes produced sneezing, but did not cause him to cough. He frequently went to an end of the building where there was no wall, in order to get fresh air. The dust did not burn his nose or eyes, and he did not wear goggles. In response to a complaint that the dust was irritating, appellee was told to wear a cloth over his nose and mouth, but did not do so. The first indication of illness came the latter part of June, 1943, about thirty days before George quit work. He lost weight, "dropping" from 208 to 162 pounds. Partial recuperation caused a gain until he "tipped the scales" at 204 or 205. Think-

ing possibly he could return to work, appellant was employed for eight days, but had no strength and had to quit.

Dr. L. F. Barrier of Little Rock, diagnostician who specializes with special reference to heart, lungs, and most diseases of the chest, examined George and found him "in good general physical condition." The patient was six feet two inches tall and at the time of the examination March 17 weighed 203¾ pounds.[3] The fluoroscope did not disclose abnormalities in the chest and the physician could not hear any:—"I examined the X-rays made by Dr. R. A. Law, Dr. D. A. Rhinehart, and Dr. Riley. I could find absolutely no evidence of any pathology in the chest which would account for his complaints. I saw no evidence of silicosis or any other irritating or inflammatory disease in his chest. I found no evidence of bronchitis."

Dr. Law testified: "My interpretation and written report was that I found nothing of any particular interest in his chest. There were no signs of silicosis and no irritation. In fact, it was about the average normal chest, such as I see from day to day."

Under our judicial system the truth or falsity of a controverted question is determinable by jury, unless that right is waived, and a finding so reached cannot be successfully challenged on appeal if supported by substantial evidence. So here, in the light of Dr. Riley's testimony, it must be held there was substantial evidence that appellee became disabled and that fair inferences sustain the contention that silica or dust of some kind caused irritation. But it does not follow that Aluminum Ore Company was negligent in not providing safe premises. To so hold would, in effect, be equivalent to a requirement that a high degree of care be exercised, and that consequences unknown to the Company should have been anticipated. Ordinary care, applied to the event, did not require the principal employer to speculate upon a *possibility* as distinguished from a probability.

Mr. Justice HART, in the Court's opinion reversing a judgment against St. Louis, I. M. & S. Ry. Co. and in

[3] The judgment is dated April 12, 1944.

favor of Copeland, (113 Ark. 60, 167 S. W. 71) correctly stated the law to be that a master's duty to his servant requires anticipation of all dangers likely to flow from the condition in which the premises are kept:—''But the master is not bound to foresee and provide against every possible accident. In other words, the duty imposed does not require the master to use every possible precaution to avoid injury to his servants, but he is only required to use such reasonable precautions to prevent accidents as would have been adopted by prudent persons prior to the accident. After an accident has occurred, it may be easy to see what would have prevented it, but that of itself does not prove, nor tend to prove, that reasonable or ordinary care would have anticipated and provided against it.''

Judge HART's reasoning is applicable to the case at bar. If after the event it be said evidence was presented tending to show that if the platforms had been kept clean there would have been no injurious dust, the fact remains that neither the plaintiff—who was an experienced construction man—nor his foreman, nor Whitson, nor any of those connected in a supervising capacity with the Company, had the slightest intimation that failure to adopt the precautions now claimed to be reasonable would have prevented George or any other workman from contracting a malady not definitely diagnosed, the exact nature of which has not been precisely determined. If speculation were permissible it might be reasonably inferred that George was peculiarly susceptible to irritating dusts, for he alone has complained. Result is that as a matter of law appellants are not liable.

Although other questions become unimportant when an appeal is disposed of on a particular ground, mention should be made of appellee's act in having subpoenas issued for B. A. Fletcher and Dan Hudspeth. The defendants asked for a drawn and struck jury and it was granted. Fletcher and Hudspeth were members of the regular panel. Counsel for the plaintiff moved that they be excused because they were to be witnesses in the case. It subsequently developed that neither George nor his

counsel had talked with the prospective jurors. On their *voir dire* each testified he knew nothing about the case and could return a fair verdict. Hudspeth was not called as a witness; and Fletcher, who was perfunctorily used, added nothing to the facts. It was shown that in a former case Hudspeth had been similarly dealt with.

Corpus Juris, v. 35, pages 312 and 313, has this comment: "It is sometimes provided by statute that a witness shall not be competent as a juror if challenged for that reason. Under such a statute it has been held that one summoned as a witness is not disqualified if he has no knowledge of material facts or is not examined as a witness. . . . Nor will a party be permitted to summons persons as witnesses who have no knowledge of the material facts in the case and then challenge them merely because he, himself, has summoned them."

Although by statute (Pope's Digest, § 8293) "No witness or person summoned as a witness in any civil cause . . . shall be sworn in the same cause as a juror," the General Assembly could not have intended that subterfuge be resorted to in order to disqualify otherwise competent jurors. Appellants say that effect of the trial Court's ruling was to allow the plaintiff five peremptory challenges.

While the issue so raised is not reached for decision, it is not inappropriate to say that in any case where the procedure complained of has been followed and there is satisfactory showing of bad faith a judgment should be set aside.

In the instant case the judgment is reversed because there was no actionable negligence. The cause, having been fully developed, is dismissed.