CARROLL   v.   LANZA et al.

JENNINGS   v.   LANZA et al.

ST. PAUL–MERCURY INDEMNITY
CO. et al.
v.
LANZA.

Civ. Nos. 352, 353, 356.

United States District Court
W. D. Arkansas, Harrison Division.

Nov. 13, 1953.

JOHN E. MILLER, District Judge.

Statement

Hereinafter, the plaintiff, Virgil C. Carroll, will be referred to as Carroll; the plaintiff, Paul A. Jennings, as Jennings; the plaintiff, Saint Paul-Mercury Indemnity Company, as the Indemnity Company; the plaintiff, Lonnie Sisney, as Sisney; the plaintiff and intervenor, Harry B. Hogan, as Hogan; and the defendant, M. Lanza, as Lanza.

The plaintiffs, Carroll and Jennings, each filed separate suits against the defendant, Lanza, in the Circuit Court of Baxter County, Arkansas, and on March 20, 1953, both of the cases were removed by the defendant to this Court on the grounds of diversity of citizenship and the amount involved. On March 27, 1953, the said defendant filed answers in the above mentioned cases.

On June 13, 1953, the plaintiffs, Sisney, Hogan and the Indemnity Company filed their complaint against the defendant, Lanza.

On June 27, 1953, the Court entered orders permitting Hogan and the Indemnity Company to intervene as plaintiffs in the Carroll and Jennings cases.

The defendant, on July 18, 1953, filed his answer to the complaint of Sisney, Hogan and the Indemnity Company.

The three cases all arose out of the same occurrence, and at the pre-trial conference on August 31, 1953, counsel for all the parties agreed that the cases should be consolidated for trial and final disposition. The Court entered a pre-trial order consolidating the cases, and further reciting that plaintiffs would not insist upon the application of the doctrine of res ipsa loquitur but that the cases should be tried upon a negligence theory.

On September 1, 1953, upon consent of counsel for the parties, the Court entered an order striking the cases from the trial calendar in the Harrison Division, upon agreement of the said counsel that the cases be tried to the Court, without a jury, at Fort Smith, in the

Goodwin & Riffel, Little Rock, Ark., Allen, Woolsey & Fisher, Springfield, Mo., A. N. Wood, Yellville, Ark., for plaintiffs.

Wright, Harrison, Lindsey & Upton, Little Rock, Ark., Shaw, Jones & Shaw, Ft. Smith, Ark., for defendant.

Western District of Arkansas, at a later date.

On October 16, 1953, defendant filed motions for summary judgment in each of the three cases, and on the same date the Court denied the defendant's said motions in the Sisney and Jennings cases on the authority of Anderson v. Sanderson & Porter, 8 Cir., 146 F.2d 58. The Court deferred its ruling on defendant's motion for summary judgment in the Carroll case until the day of the trial, at which time the Court denied the motion for the reason that there appeared from an examination of the affidavits and depositions on file in support of and in opposition to the motion a question of fact regarding the alleged election of Carroll to accept compensation benefits under the Missouri Workmen's Compensation Law, V.A.M.S. § 287.010 et seq., instead of the Arkansas Act, Ark.Stats. § 81–1301 et seq.

On November 5 and 6, 1953, the cases were tried to the Court, without a jury, and at the conclusion of plaintiffs' evidence, the defendant moved for judgment in its favor in each of the three cases on the merits. The defendant also moved for judgment in the Carroll case on the specific ground that he had elected to accept compensation payments under the Missouri Workmen's Compensation Law, and that such remedy was exclusive, thus precluding the institution of this suit by Carroll. The Court denied defendant's motion in all of the cases on the merits, but deferred its decision on the specific motion attacking the jurisdiction of the Court in the Carroll case until the conclusion of the trial on the merits.

Now, the Court, having considered the pleadings, ore tenus testimony of the witnesses, exhibits, stipulations, written briefs and oral arguments of the attorneys for the respective parties, makes and files herein its findings of fact and conclusions of law, separately stated.

### Findings of Fact

#### I.

The plaintiffs, Carroll and Hogan, are citizens and residents of Missouri. The plaintiffs, Jennings and Sisney, are citizens and residents of Arkansas. The plaintiff, Indemnity Company, is a corporation organized and existing under the laws of Delaware, and is the insurance company carrying workmen's compensation insurance on Hogan and his employees. The defendant, Lanza, is a citizen and resident of Louisiana. The amount in controversy, exclusive of interest and costs, exceeds the sum of $3,-000 in each of the three cases.

#### II.

Carroll was a foreman and a regular employee of Hogan and had been for several years. Both Carroll and Hogan were and are residents of Missouri and the employment contract between them was entered into in that State. The accident involved herein occurred in Arkansas.

The defendant, Lanza, had a contract with the United States Government in connection with the construction of the Bull Shoals Dam in Arkansas. On January 22, 1952, Hogan entered into a contract with Lanza whereby Hogan agreed to furnish all labor, material and necessary scaffolds and ladders to perform all the general painting required by the contract Lanza had with the Government. A supplemental contract was entered into for the painting of the "trash racks" as set forth in finding of fact Number 3.

Hogan had secured workmen's compensation insurance from the Indemnity Company covering his employees in both Arkansas and Missouri. Subsequent to the accident, Carroll received thirty-four weekly payments of $30 each in accordance with the Workmen's Compensation Law of Missouri. These payments were made by drafts drawn on the Indemnity Company and were delivered to Carroll by Mr. Fisher of the firm of Allen, Woolsey & Fisher, attorneys representing the Indemnity Company.

In March, 1953, Carroll instituted the present suit. Sometime prior to October 10, 1953, defendant's attorney transmitted to Carroll's attorney a proposed stipulation to the effect that Carroll was

receiving compensation under the Missouri law. The stipulation was not executed and on October 10, 1953, after consulting his attorney, Carroll wrote to the Indemnity Company informing said company that he desired to receive his compensation under the Arkansas Workmen's Compensation Law rather than the Missouri law. Prior to consulting his attorney on October 10, 1953, Carroll did not know that he had the right to receive compensation under the Arkansas law, and, in fact, he did not know that the $30 weekly payments were being made under the Missouri law. In other words, Mr. Fisher and the Indemnity Company handled the matter, and all Carroll knew was that he was receiving $30 per week compensation from the Indemnity Company. Carroll signed nothing acknowledging the fact that he was receiving compensation under the Missouri law, and no report of injury or any other notice of the accident or injury to Carroll was ever filed by Carroll with the Division of Workmen's Compensation of the State of Missouri, but he depended upon his present attorneys, Allen, Woolsey & Fisher, who were and are the attorneys for the Indemnity Company, to look after the collection and payment of benefits under the Workmen's Compensation Act.

After receiving the letter from Mr. Carroll, the Indemnity Company wrote to the Arkansas Workmen's Compensation Commission concerning Carroll's desire to receive compensation pursuant to the Arkansas law. In its letter to the Commission the Indemnity Company enclosed Employer's First Report of Industrial Injury, Form A–8; Report of Initial Payment of Compensation, Form A–9; Surgeon's Report, Form A–12; and a photostatic copy of Carroll's letter to the Indemnity Company. Upon the filing of the above mentioned papers, the Arkansas Workmen's Compensation Commission accepted said filing and assigned thereto its Claim No. A329223 and Carroll is now receiving weekly benefits of $25.00 under the Workmen's Compensation Laws of Arkansas.

## III.

By letter of November 7, 1952, Hogan submitted to Lanza a bid to paint eighteen "trash racks". The letter provided, inter alia, "After racks have been set in upright position and arranged so as to be accessable for painting, all areas are to be cleaned of rust by wire brushing and sandpaper and given three coats of Coal Tar Paint as specified by Army Engineers. * * * The above price does not include sand-blasting or setting racks in position for painting." On November 14, 1952, defendant, by letter, authorized Hogan to proceed with the painting "as proposed in your letter dated November 7, 1952."

It was necessary to enter into this supplemental contract because the original contract between Lanza and the Government did not cover the painting of the trash racks.

The "trash racks" referred to herein are constructed as follows:

The outside metal frames when in an upright position are approximately 13 feet long, 10 feet high, and 12 inches wide. Inside the frames there are four cross bars extending across said frames parallel to the ground and about 2 feet apart. Also inside the frames there are 25 steel "fins" which are approximately 10 feet long, 5 inches wide, and 7/8 of an inch thick. When the racks are in an upright position, the fins are perpendicular to the ground and 10 feet high, i. e., approximately the height of the rack. The sides of the fins which are 5 inches wide are parallel to the ten-foot ends of the outside frames. Approximately 3 inches of the width of each fin is within the frame and 2 inches of each fin protrudes from the frame. In other words, a side view of a trash rack in an upright position discloses the 12-inch side of the solid metal frame with the fins protruding 2 inches out of the frame for the full height of the rack, making a total width of 14 inches including the fins. The fins in a rack weigh approximately 4,000 pounds and the remainder of the rack weighs approximately 1,400 pounds,

constituting a total weight of 5,400 pounds. Therefore, the side of the frame from which the fins protrude weighs a great deal more than the opposite side and the center of gravity is not in the center of the twelve inch base but to the side from which the fins protruded. On the top of each trash rack are two "lifting eyes", one toward each end of the rack. The lifting eyes are curved metal bars, both ends of which are attached to the top of the trash rack, and these lifting eyes are evidently designed to facilitate the moving and handling of the trash racks.

In the latter part of November, 1952, defendant's employees delivered the trash racks to the place where they were to be painted, which place was south of the Bull Shoals Dam and east of the river. The racks were first stacked flat on the ground in six stacks of three racks each. While the racks were in this position, Carroll, Jennings and Sisney cleaned and painted the outer flat surfaces of the racks and some of the fins. Following that, defendant's employees set the racks in an upright position to be painted by Hogan's employees. The racks were set up as follows:

Pieces of 2" by 12" lumber from 2 to 4 feet long were placed on the ground and two railroad rails were placed on the boards. The rails were placed parallel to each other, about 8 or 9 feet apart, and were running from south to north. Defendant's employees used a carpenter's level and placed the rails in such a manner as to make them absolutely level. After the rails were placed, defendant's employees used a truck with an A frame to lift the racks and place them upright on the rails so that the racks rested across said rails and perpendicular thereto. As the racks were put in place, about 3 feet apart, two "spreader braces" were cut and placed between each two adjacent racks. The spreader braces consisted of 2" by 4" pieces about 3 feet long to which two short pieces of 1" by 4" were nailed. A spreader brace was made by measuring the distance between the two adjacent racks and sawing a 2" by 4" to that length. Then the 2" by 4" was placed flat and a short piece of 1" by 4" was placed, also flat, on each end of the 2" by 4" and extending out a few inches beyond the end thereof. The two pieces of 1" by 4" were nailed to 2" by 4", thus completing the spreader brace. When the spreader braces were completed and were placed between two racks, the short pieces of 1" by 4" rested on top of the racks supporting the 2" by 4" which rested between the racks. When in position, the spreader braces were parallel to the rails and near the lifting eyes of the adjacent racks. The braces were not attached to the racks in any manner, but merely rested on top of the racks as above described.

The preceding procedure was followed until ten racks were set upright on the two parallel rails. Then the end racks were anchored by double strands of number 9 wire attached to the lifting eyes and extending to metal pins which were set in the ground a few feet from the said end racks. Also, each two adjacent racks were fastened to each other by means of number 9 wire which was attached to the lifting eyes of the said adjacent racks. Thus, each rack was attached to the next in two places, i. e., from the two lifting eyes on one rack to the two lifting eyes on the next rack, and the two end racks were each supported by two guy wires extending to metal pins in the ground. All the wires ran parallel to the steel rails.

After the ten racks were placed, another set of two rails was placed east of the said ten racks and parallel to the first set of rails. Then, eight racks were placed on the second set of rails in the same manner as the first ten racks were placed, the only difference in the placing of the two sets of racks being that the southeast guy wire in the eight-rack row was attached to the rail rather than a metal pin. All the racks in the eight-rack row except one were placed so that the fins were toward the north. When the eight-rack row was completed, there was an aisle of approximately four feet between said row and the ten-rack row.

All of the aforesaid work connected with the setting of the racks in an upright position was done by the defendant's employees as required by the contract between Hogan and Lanza.

Carroll was notified that the racks had been placed in position, and he, Jennings and Sisney proceeded with the painting of the racks. They first used power sanders and power buffers to clean the racks. Then they applied a primer coat and a second coat to the racks, and on the day of the accident, January 26, 1953, they were applying the third and final coat of paint to the eight racks. Up to the day of the accident about seven weeks had elapsed since the painting of the racks began and since they had been placed in position for painting. Their work was intermittent for two reasons. (1) they could paint only when the temperature was above 50° and (2) they could not paint when excessive moisture was on the racks. Thus, during the seven weeks they had actually worked only 160 man hours on the racks. The work, at best, was fairly slow because it was necessary to heat the paint to 100° before it could be applied. The paint was applied with a regular heavy duty four-inch brush. It was necessary to use a scaffold for the painting of the upper portions of the racks, and such a scaffold was made by placing three 2″ by 4″ pieces parallel to the rails, each 2″ by 4″ resting on the cross bars of the two adjacent racks. Then a 2″ by 8″ work plank was placed on the 2″ by 4″ pieces, thus making the scaffold.

### IV.

On January 26, 1953, Jennings and Sisney arrived at the location of the racks about 8:00 a. m. and built a fire for the heating of their paint. Carroll arrived about 8:30 and assisted in the preparatory work.

On the same morning, Mr. C. C. Hargis, defendant's superintendent, along with two of defendant's employees, H. D. Crosby and David York, loaded some scrap lumber in a pick-up truck and proceeded to the location of the racks.

The rails supporting the racks belonged to the United States Government, and, upon its request for the rails, the defendant's employees found it necessary to remove said rails. This was the first time since the racks were set up in November that defendant's employees did any work in or about the said racks. Upon arrival at the racks about 8:30 a. m., defendant's employees unloaded the scrap lumber south of the racks and then began experimenting in an effort to ascertain a suitable method of removing the rails. They secured a 4″ by 6″ fir pry pole about 12 feet long and, using a block for leverage, attempted to pry up the west end of the first rack on the south end of the ten-rack row. However, they discovered that it would take more men to handle the job, and they spent their time carrying cross ties and "cribbing" (small pieces of scrap lumber) while waiting for more help to arrive. About 9:00 a. m., Mr. Doyne Hurst, defendant's foreman in charge of the placing of the racks, and three other employees of defendant arrived at the racks to perform the work of removing the rails. Someone had removed most, if not all, of the spreader braces from their proper places. Mr. Hurst noticed this, but he did not have them replaced, apparently because he did not think they were necessary or important.

The operation of removing the rails was performed as follows:

A 7″ by 9″ or a 6″ by 8″ cross tie, about 8 feet long, would be placed under the racks, parallel to the rails and just inside the rail nearest the end of the rack to be raised. This cross tie could be placed without raising the racks. Then two men would use the pry pole and raise one end of the rack while Mr. Hurst placed enough cribbing on top of the cross tie to hold the rack, when the pry pole was removed, above the rail sufficiently to permit the removal thereof. They did not use a level to ascertain whether the racks, after the rails were removed, were still level when resting on the cross ties and cribbing. Since

498

the aisle between the two sets of racks was only four feet wide, it was necessary for the men operating the pry pole to stand between the racks in the eight-rack row while raising the east end of the racks in the ten-rack row. The racks in the two rows were not even with each other, and thus the pry bar was not always exactly parallel to the rack being raised.

The ground on which the racks were placed was filled dirt and was wet and soft at this time.

Defendant's employees began work on the west end of the rack on the south end of the ten-rack row and proceeded to raise and block the west ends of all the racks in the ten-rack row. They next raised and blocked the east ends of said racks in the ten-rack row. After completing the work on the ten-rack row, they began work on the eight-rack row, starting with the west end of the rack on the north end of the said eight-rack row. At the time of the accident they were working on the west end of the third, fourth or fifth rack from the south.

In the meantime, Carroll, Jennings and Sisney, being unable to commence painting because of the moisture on the racks, went to get coffee at a place about one and one-half miles from the racks. They returned about 10:30 while defendant's employees were raising the ten-rack row and began painting the racks in the eight-rack row. Carroll stayed on the ground and painted the lower portion of the racks while Jennings and Sisney worked on the scaffold painting the upper portion of the racks. They began at the south end and at the time of the accident, Carroll was painting the lower part of the south side of the third rack from the south. Jennings and Sisney were on the scaffold between the fourth and fifth racks, numbering from the south. Jennings was painting the south side of the fifth rack and Sisney was painting the north side of the fourth rack.

At about 11:30 a. m. on January 26, 1953, the southwest guy wire on the eight-rack row broke and all eight racks fell toward the north, which was the side on which the fins protruded. Defendant's employees were working on the said row at the time the racks fell, but the pry bar was not being used at that exact time. When the racks fell, Carroll attempted to get free but his left forearm was caught between the second and third racks. Sisney was thrown clear of the racks, but Jennings was caught between the fourth and fifth racks.

### V.

The plaintiffs, Carroll, Jennings and Sisney, knew that defendant's employees were working on the ten-rack row, and knew generally the nature of the work they were doing. However, none of defendant's employees notified the said plaintiffs that they had begun work on the eight-rack row, apparently because, as Mr. Hurst testified, "They had a foreman there," referring to Carroll. There is no direct testimony that any of plaintiffs knew that defendant's employees had begun to raise the eight-rack row and to remove the iron rails and to substitute therefor cross ties and cribbing as a foundation for the eight racks to rest upon. There was proof of some circumstances that tended to show plaintiffs saw the defendant's employees at work on the eight-rack row but all of the plaintiffs testified that they did not know that the employees of defendant had moved over to the eight-rack row where plaintiffs were busily engaged in painting which required their full and complete attention. When all the facts and circumstances are considered, the court is convinced that the plaintiffs did not know that the defendant's employees were raising the eight-rack row and substituting cross ties and cribbing for the railroad rails foundation.

### VI.

As heretofore stated, Carroll's forearm was caught between two racks, and he was held there for about half an hour before they could extricate him. He was then taken to Mountain Home, Arkansas, and from there to Saint John's Hospital

in Springfield, Missouri. At the time of entry in the hospital he was suffering from partial shock, pain in his arm, shoulder, back and chest, and a fracture of both bones of his left forearm. It was a crushing type of injury, and X-rays revealed that he had a comminuted fracture of his forearm, but his chest, back and shoulder were not fractured. He suffered intense pain during the trip to the hospital, and it was necessary to give him narcotics to relieve the pain. The following morning, January 27, 1953, an operation was performed on the radius bone of his left forearm. A plate approximately 2½ inches long, ⅜ of an inch wide, and 1/16 of an inch thick was attached to the radius by means of two screws in each piece of the fractured bone. About ten or twelve days later a similar operation was performed on the ulna bone of the left forearm. While he was in the hospital, a period of about two months, and for several weeks thereafter he was required to have physical therapy every day, and necessarily suffered a great deal of pain during these treatments. Following his first operation he had some urinary trouble, and following his second operation he had a lung infection similar to pneumonitis. His arm remained in a plaster cast from the time of entry in the hospital until May, 1953.

He suffered a sprained shoulder with some limitation of motion and a contusion of his back with some low back strain.

At the present time Carroll has had a satisfactory recovery from all his injuries except the fractured forearm. There is some limitation of motion of the left wrist and hand and a considerable amount of atrophy. X-rays disclose that he has not produced sufficient bone around the fracture of the radius, and, upon his doctor's advice, he intends to have another operation to remedy this situation. The new operation will require the removal of approximately a ¾ inch cube from his pelvic bone to be placed in or on the fractured part of the radius. He will have to stay in the hospital from three to six weeks and cannot work for at least six months.

If Carroll has another operation, he will still have approximately 20 per cent permanent disability of his left arm as a whole. If he does not have the operation, he will have a permanent disability of his left arm in the amount of approximately 35 per cent. However, this disability will decrease some as the function of the arm improves.

Carroll is 53 years old and at the time of the accident he was earning $125 to $130 per week, plus expense money. During the last 10 years his wages have averaged approximately $5,000 per year. Since the accident he has not been able to work as a painter and will not be able to do such work for several months.

As a result of the accident Carroll has incurred doctor and hospital bills in the sum of $1,403.05 and will incur further doctor and hospital expenses when the new operation is performed. (Doctor William H. Snead, Carroll's physician, stated that his fee for the new operation would be $250.)

## VII.

Jennings was caught bodily between two racks and remained there about thirty minutes before he was extricated.

Two days later, January 28, 1953, Jennings reported to the Saint John's Hospital in Springfield, Missouri. At that time he had pain in his back, chest and in the public symphysis region. X-rays revealed that he had a linear fracture of the right pubic ramus, without displacement. He had no fracture in his back or chest, but did have a low back strain.

He remained in bed and in traction for four and one-half weeks. His injury was painful for four or five days and he was uncomfortable while in traction. While in the hospital he was given several narcotic injections to ease his pain.

His recovery was good and he was released from treatment on April 10, 1953. However, he does have a slight

permanent disability in his low back, and he still suffers some pain in his back when he sits in one position for a long time, such as when driving an automobile.

Jennings is 19 years of age and at the time of the accident was earning $44 per week. He was not able to do any heavy work for about three months after the accident.

As a result of the accident Jennings has incurred medical expenses in the sum of $597.80.

## VIII.

On the day of the accident Sisney was taken to Saint John's Hospital in Springfield, Missouri, in a state of severe shock. X-rays revealed that he had a severe fracture of the pelvis on both sides, fracture of the sacrum, and fracture of the greater trochanter. He suffered intense pain as a result of these fractures, as well as the treatment thereof, but at the present time he has enjoyed a satisfactory recovery from his orthopedic injuries, although he does have some loss of motion of the low back. Insofar as these injuries are concerned, he was released for work as of September 1, 1953.

However, the most serious injury Sisney sustained was the injury to his urinary tract. He suffered a ruptured urethra and was in a very grave condition after the accident. It was necessary to operate, and at one time he was pulseless and his blood pressure could not be registered. The next day his condition improved some and he was given narcotics to relieve his pain. As a result of blood transfusions he experienced a liver disorder accompanied by fever, nausea and inability to eat food.

Sisney remained in bed for six weeks and had to keep a catheter in his bladder for eight weeks. The operation had been performed while he was in a critical condition, and as a result of the operation he had a false passage from the urethra. However, he was able to void a good stream through the false passage, and on March 24, 1953, he was released from the hospital. On March 30, 1953, he was readmitted because he had difficulty voiding, and on March 31 he received urethral dilation. On April 10 he was again admitted to the hospital with the same difficulty and on April 14 another operation was performed in order to discard the false passage. He was dismissed on May 2, but returned on May 9 with discomfort due to infection. He was dismissed May 16 and readmitted on May 20 with the same trouble. He was dismissed on June 3, making a total of five admissions to the hospital. Since his last dismissal from the hospital, he has been dilated by a doctor every two weeks. This treatment consists of passing a hollow tube through his penis into his bladder and helps him to void more freely. It will be necessary for him to have the treatments the rest of his life, but the intervals will gradually lengthen and if his improvement is good he may not have to be treated more than once or twice a year. These treatments, of course, are painful and unpleasant.

Prior to the accident Sisney was able-bodied and mentally alert, but he has suffered profound emotional distress as a result of his injuries, and has lost about 25 pounds in weight. He has been impotent since the occurrence of the injuries, but this condition is probably aggravated by his mental condition and may be overcome in due time. His permanent disability is approximately 10 per cent.

Sisney is 35 years of age and at the time of the accident was earning $1.95 per hour. In 1952 he earned $3,800. He has not been able to work since the accident, but should be able to work within a period of four to six months if his recovery is normal.

As a result of the accident Sisney has incurred medical expenses in the sum of $4,546.50, and he will be required to expend money for medical attention in the future for dilation treatments.

### Discussion

It is necessary to consider the motion of defendant attacking the jurisdiction of the Court in the Carroll case before proceeding to a discussion of the merits of any of the cases.

The defendant contends that Carroll has elected to accept compensation payments under the Missouri Workmen's Compensation Law and is therefore precluded, by the Missouri law, from the maintenance of this common-law suit. Carroll, on the other hand, contends that he has elected to accept compensation under the Arkansas Workmen's Compensation Law, rather than the Missouri act, and that under the Arkansas law he is entitled to maintain this action against the defendant as a third party.

■■ At the outset it may be stated that two principles of law are firmly established. Under the Missouri law, an employee of a subcontractor cannot sue the general contractor as a third party and at the same time collect compensation from his immediate employer—when the injury is within the Missouri Workmen's Compensation Act. Bunner v. Patti, 343 Mo. 274, 121 S.W.2d 153; New Amsterdam Casualty Co. v. Boaz-Kiel Const. Co., 8 Cir., 115 F.2d 950. Conversely, under the Arkansas law an employee of a subcontractor can sue the general contractor as a third party and at the same time collect compensation from his immediate employer under the Arkansas Workmen's Compensation Act. Anderson v. Sanderson & Porter, 8 Cir., 146 F.2d 58.

Thus, the real question presented for determination is whether the right of Carroll to maintain the instant common-law suit is controlled and determined by the Arkansas Workmen's Compensation Act and the Arkansas law, or by the Missouri Workmen's Compensation Act and the Missouri law.

■■ Carroll is a citizen and resident of Missouri and the contract of employment was entered into in that State. Under the Missouri Workmen's Compensation Law, employers and employees are conclusively presumed to have elected to accept the provisions of the act unless prior to the accident they file with the Commission written notice of election to reject the act. Section 3300, Mo.St.Ann., V.A.M.S. § 287.060; Hope v. Barnes Hospital, 227 Mo.App. 1055, 55 S.W.2d 319; Walker v. Sheffield Steel Corp., 224 Mo.App. 849, 27 S.W.2d 44. And the Missouri act applies to injuries received outside the state under a contract of employment made in the state. Section 3310, Mo.St.Ann., V.A.M.S. § 287.110; Hungate v. Hudson, Mo.Sup., 169 S.W.2d 682. Therefore, Carroll undoubtedly was covered by the Missouri Workmen's Compensation Law at the time of his injury.

Since Carroll was covered by the Missouri act, and under said act could not maintain the present suit against the defendant, the question arises as to whether the Full Faith and Credit Clause of the United States Constitution requires the State of Arkansas, and this Court, to apply the bar thus erected by the Missouri act and prohibit the prosecution of the present suit by Carroll against the defendant.

If the decision of the Supreme Court in the case of Bradford Electric Light Company, Inc. v. Clapper, Adm'r, 286 U.S. 145, 52 S.Ct. 571, 76 L.Ed. 1026, were the last pronouncement of the Court on the question, there is little doubt but that the Full Faith and Credit Clause would require the application of the Missouri bar, because the facts in that case were substantially the same as the facts in this case. However, over a period of years the holding and rationale of the Clapper case have been so modified by later decisions of the Supreme Court that the extent and force of the opinion is, to say the least, doubtful.

In Pacific Employers Insurance Co. v. Industrial Accident Commission, 306 U.S. 493, 59 S.Ct. 629, 83 L.Ed. 940, a Massachusetts employee of a Massachusetts employer was injured while working in California. The Court, in holding that California could apply its own Workmen's Compensation Act, made the

following observation concerning the Clapper case at page 504 of 306 U.S., at page 634 of 59 S.Ct.:

"The Clapper case cannot be said to have decided more than that a state statute applicable to employer and employee within the state, which by its terms provides compensation for the employee if he is injured in the course of his employment while temporarily in another state, will be given full faith and credit in the latter when not obnoxious to its policy."

At page 503 of 306 U.S., at page 633 of 59 S.Ct., the Court said:

"Few matters could be deemed more appropriately the concern of the state in which the injury occurs or more completely within its power."

See also, Alaska Packers Ass'n v. Industrial Accident Commission of California, 294 U.S. 532, 55 S.Ct. 518, 79 L.Ed. 1044.

The rule now seems to be that any state having a substantial connection with the employee-employer relationship may apply its own Workmen's Compensation Act. Cardillo v. Liberty Mutual Insurance Co., 330 U.S. 469, 476, 67 S. Ct. 801, 91 L.Ed. 1028. See also, Industrial Commission of Wisconsin v. McCartin, 330 U.S. 622, 67 S.Ct. 886, 91 L.Ed. 1140. (Permitting recovery under both the Illinois and the Wisconsin Acts.) And, a state having the right to apply its own Workmen's Compensation Act would also have the right to apply its own third party practice. See, Vol. 2, Larson's Workmen's Compensation Law, Section 88.23, Page 407.

■ In the instant case, the accident occurred in Arkansas and this State may apply its own Workmen's Compensation Law and its own third party procedure. Especially is this true in view of the established public policy in Arkansas favoring the common-law right of action for injuries to persons and property. Amendment 26 to the Constitution of the State of Arkansas adopted in 1938 amended Article 5, Section 32, to permit the enactment of a Workmen's Compensation Law, but the said Amendment provided that "otherwise no law shall be enacted limiting the amount to be recovered for injuries resulting in death or for injuries to persons or property * * *." In Young v. G. L. Tarlton, Contractor, Inc., 204 Ark. 283, at page 288, 162 S.W.2d 477, at page 479, the Court said:

"The amendment provides that otherwise, that is, except in cases arising between employer and employee, no law shall be passed limiting the amount to be recovered for injuries resulting in death or for injuries to persons or property."

In Anderson v. Sanderson & Porter, supra, the Court, after quoting from the Young case, 146 F.2d at page 62 said:

"We think it is safe to say that an action brought against a general contractor by an employee of a subcontractor of a subcontractor is not a 'case arising between an employer and an employee' within the meaning ordinarily attributed to the words quoted."

But see, Brothers v. Dierks Lumber & Coal Company, 217 Ark. 632, 640, 232 S.W.2d 646.

The Arkansas Supreme Court has consistently applied the law of the place of the injury in determining whether a person has a common-law right of action. In cases where the injury occurred in another state, which state made recovery under its Workmen's Compensation Law exclusive, the Court enforced the bar of the other state and refused to entertain an action in this State. Magnolia Petroleum Company v. Turner, 188 Ark. 177, 65 S.W.2d 1; Logan v. Missouri Valley Bridge & Iron Co., 157 Ark. 528, 249 S.W. 21. The rationale of these cases is, of course, that if there is no right of action in the state wherein the injury occurred, there is no right of action in any state. See also, Tucker v. Texas Co., 5 Cir., 203 F.2d 918; Bagnel v. Springfield Sand & Tile Co., 1 Cir., 144 F.2d 65; Restatement, Conflict of

Laws, 1948 Supp., Section 401. However, where the accident occurred in this State, the Court has refused to enforce the bar of the Workmen's Compensation Act of another state. Haynes Drilling Corporation v. Smith, 200 Ark. 1098, 1106, 143 S.W.2d 27. And, in Smith v. Arkansas Power & Light Company, 191 Ark. 389, at page 395, 86 S.W.2d 411, at page 414, the Court said:

> "It is true, of course, as appellant insists, that, as he was injured in this state, his right to recover compensation for those injuries and the amount thereof must be determined by the laws of this state, uninfluenced by the compensation laws of the state in which plaintiff was employed."

■ Therefore, it seems that the Full Faith and Credit Clause provides no obstacle to the application of the Arkansas Workmen's Compensation Law and third party practice in the instant case.

■ Of course, even though a state is not required to do so, it may, as a matter of comity, enforce the bar erected by the Workmen's Compensation Law of the state where the contract of employment was made. See, Ohlhaver v. Narron, 4 Cir., 195 F.2d 676. But, the Court feels that the public policy of Arkansas favoring common-law actions for damages to persons and property, and favoring the application of the law of the place of the injury, precludes the application of the bar of the Missouri Act in this case.

■ While it is true that Carroll, as a matter of Missouri law, "elected" to come within the coverage of the Missouri Act by failing to reject the Act prior to the accident, that does not preclude him from "electing" to receive his compensation payments under the Arkansas Act. Insofar as his election between the two Acts is concerned, it is clear that Carroll has elected to receive his compensation payments under the Arkansas Act. At the time he was receiving payments under the Missouri Act he did not know that he had the right to receive payments under the Arkansas Act, nor did he know that the payments were, in fact, being made under the Missouri Act.

In City National Bank v. McCann, 193 Ark. 967, at page 980, 106 S.W.2d 195, 202, the Court said:

> "Therefore, the case of Craig v. Meriwether, 84 Ark. 298, 105 S.W. 585, 587, cited by plaintiffs is controlling. 'The binding force of an election cannot be predicated upon mere imputed knowledge; for the doctrine is based entirely upon the idea of a conscious exercise of choice between one of two remedies which are inconsistent with each other. * * * "In order that a person who is put to his election should be concluded by it, two things are necessary: First, a full knowledge of the nature of the inconsistent rights, and of the necessity of electing between them; second, an intention to elect, manifested either expressly or by acts which imply choice and acquiescence." ' "

See also, Haynes Drilling Corporation v. Smith, supra, 200 Ark. at pages 1106–1107, 143 S.W.2d 27; 8 A.L.R.2d 628–629; 28 C.J.S., Election of Remedies, § 23, p. 1097.

It was not until October 10, 1953, that Carroll exercised a conscious choice between two inconsistent remedies, and it was not until then that he made an election as to which act he desired to govern his compensation payments. His decision was to accept such payments under the Arkansas act, and the Arkansas Workmen's Compensation Commission accepted the filing of his claim.

The accident occurred in Arkansas, and it would seem that by virtue of Sections 81–1302 and 81–1303, Arkansas Statutes 1947, Annotated (1951 Supp.), Carroll's claim may be granted under the Arkansas act. And, since he is receiving compensation under the Arkansas act, he is also entitled to the benefit of its third party rule permitting an employee of a subcontractor to prosecute a suit against the general contractor. Therefore, the Court has jurisdiction of the action brought by Carroll against the defendant

herein, and defendant's motion for judgment should be denied.

On the merits of the cases, three questions are presented. (1) Was the defendant guilty of negligence which was a proximate cause of the plaintiffs' injuries? (2) If the defendant was guilty of such negligence, were the plaintiffs guilty of contributory negligence, thus precluding the recovery of damages by them? (3) Did plaintiffs assume the risk of their employment, likewise precluding the recovery of damages by them?

Of course, since the accident occurred in Arkansas, the law of this State governs the substantive rights of the parties. The burden of proof is upon plaintiffs to prove by a preponderance of the evidence that the defendant's employees were guilty of negligence, and that such negligence was the proximate cause of the injuries received by the plaintiffs. Roark Transportation, Inc., v. Sneed, 188 Ark. 928, 68 S.W.2d 996.

Negligence is the failure to do that which a person of ordinary care and prudence would do under the same or similar circumstances, or the doing of something which a person of ordinary care and prudence would not have done under the same or similar circumstances. St. Louis-San Francisco Ry. Co. v. Ward, 197 Ark. 520, 524, 124 S.W.2d 975; Self v. Kirkpatrick, 194 Ark. 1014, 1022, 110 S.W.2d 13.

Negligence is the proximate cause of an injury only if the injury is the natural and probable consequence of the negligent act and ought to have been foreseen in the light of attending circumstances. Ozark Packing Co. v. Stanley, 211 Ark. 749, 202 S.W.2d 352; Hook, Administrator, v. Reynolds, 203 Ark. 259, 261, 156 S.W.2d 242.

A general contractor in control of premises upon which work is being done has a duty to exercise ordinary care to furnish to the employees of his subcontractor a reasonably safe place to work. In Aluminum Ore Company v. George, 208 Ark. 419, at page 424, 186 S.W.2d 656, 659, the Court quoted with approval from 35 Am.Jur., page 590, the following:

"In amplification of this rule it may be said that where any person is brought upon premises belonging to the individual charged with negligence, there is a duty to inform the person who is brought upon the premises of anything in the nature of a trap from which he may suffer. The principal employer has been said to be bound in law to use reasonable care and caution to provide and maintain a safe place in which the servants of the independent contractor can work, although not bound absolutely to provide and maintain such a place; the duty is fulfilled if reasonable care is used to protect the plaintiff from injury, in supplying and maintaining a safe place. * * *"

In Smith v. Henger, 148 Tex. 456, 226 S.W.2d 425, at page 431, 20 A.L.R.2d 853, at page 863, the court said:

"The law places upon the owner or occupant of land the duty to use reasonable care to make and keep the premises safe for the use of persons invited to use the premises for business purposes * * *. Included within the class of persons to whom this duty is owed are the employees of contractors performing construction or other work on the premises. * * * When the owner puts some other person in control of the premises or a part of them, such person likewise has the duty to keep the premises under his control in safe condition. * * * A general contractor on a construction job, who is in control of the premises, is burdened with the duty to use due care to provide a safe place for workmen on the premises, including the employees of other contractors. * * *

"Where the duty to keep premises in a safe condition is imposed on a person in control of them, this duty may include the duty to inspect the

premises to discover dangerous conditions * * * or to warn such persons of the existence of dangers which could not reasonably be expected to be apparent or obvious * * *. The standard by which this duty is measured is that of reasonable care, and whether the duty has been properly discharged depends on the facts of each case."

See also, 20 A.L.R.2d 868–918; Restatement, Torts, Sections 343 and 387; Kuptz v. Ralph Sollitt & Sons Const. Co., 5 Cir., 88 F.2d 532, 534.

When a general contractor and a subcontractor are working on the same premises, it is the duty of each contractor to use ordinary care not to injure the employees of the other contractor. 57 C.J.S., Master and Servant, § 610, p. 381. See also, Sinclair Prairie Oil Co. v. Thornley, 10 Cir., 127 F.2d 128.

Applying the above rules of law to the facts in the instant case, it is apparent that the defendant's employees were guilty of negligence which was the proximate cause of the injuries received by plaintiffs. Not only did they begin working on the row of racks where plaintiffs were painting without warning them, but they also (1) raised the racks, thus exerting more pressure on the supporting wires which were already taut; (2) replaced the racks without ascertaining that they were level; (3) replaced said racks on scrap ties and cribbing set on soft wet ground, which would necessarily cause some settling of the racks; and (4) operated the pry bar, at least part of the time, at an angle, thus increasing the possibility of replacing the racks in an unbalanced position. None of these acts were the acts of ordinary prudent persons, and certainly when the acts are considered collectively, there is no doubt but that the activities of defendant's employees caused the racks to fall and that said employees were guilty of negligence. In other words, the defendant, acting through his employees, neither furnished plaintiffs with a reasonably safe place to work, nor did he exercise ordinary care to avoid injuring the plaintiffs, who were employees of his subcontractor.

This brings the Court to the question, were plaintiffs guilty of contributory negligence or assumption of risk.

Both contributory negligence and assumption of risk are affirmative defenses, and the burden is upon the defendant to prove by a preponderance of the evidence such contributory negligence or assumption of risk on the part of the plaintiffs, unless the proof introduced by the plaintiffs establishes that they were guilty of contributory negligence. Chapman v. Henderson, 188 Ark. 714, 720, 67 S.W.2d 570; Covington v. Little Fay Oil Company, 178 Ark. 1046, 1051, 13 S.W.2d 306; Sun Oil Company v. Hedge, 173 Ark. 729, 740, 293 S.W. 9.

Contributory negligence is the doing of something by the plaintiffs which a person exercising ordinary care and prudence would not have done under the same or similar circumstances, or the failure of the plaintiffs to do something which a person exercising ordinary care and prudence would have done under the same or similar circumstances, and which conduct on the part of the plaintiffs contributed, however slightly, in whole or in part, to the occurrence and injuries, and without which the occurrence and injuries would not have occurred. Kirby v. Swift & Co., 199 Ark. 442, 446, 134 S.W.2d 865; Kittrell v. Wilkerson, 177 Ark. 1174, 9 S.W.2d 788; Russ v. Strickland, 130 Ark. 406, 197 S.W. 709.

An employee assumes all the ordinary risks and hazards incident to his employment, and when his knowledge concerning his employment exceeds that of his employer, the employer is not liable to him for injuries sustained as a result of said employment. Benedum-Trees Oil Company v. Sutton, 198 Ark. 699, 130 S.W.2d 720; Arkansas Western Gas Co. v. Bragg, 194 Ark. 402, 404, 107 S.W.2d 528.

In M. E. Gillioz, Inc., v. Lancaster, 195 Ark. 688, at page 698, 113 S.W.2d 709, 713, the Court said:

"Of course, this court has always held that where the danger arising from an employment is so apparent and obvious in its nature as to be at once discoverable to one of ordinary intelligence, an employee, by voluntarily undertaking to perform his work in such a situation, assumes the hazards which exempts the employer from liability on account of injury to the employee."

See also, Long Bell Lumber Co. **v.** Tarver, 196 Ark. 275, 118 S.W.2d 282.

However, an employee does not assume the risk of a hazard caused by the master's negligence, and the employee may rely upon the master's judgment unless the danger is so obvious that no prudent man would incur it under like circumstances. Haynes Drilling Corporation v. Smith, 200 Ark. 1098, 143 S.W.2d 27; Carson v. Dierks Lumber & Coal Company, 196 Ark. 163, 170, 117 S.W.2d 39; Federal Compress & Warehouse Company v. Harmon, 196 Ark. 417, 432, 118 S.W.2d 239.

The doctrine of assumed risk is based upon voluntary exposure to a known danger. Chicago, Rock Island & Pacific Railway Company v. Lewis, 103 Ark. 99, 104, 145 S.W. 898. The defense of assumed risk will be applied in cases fairly within the rule, but it is not a favored doctrine, being artificial and harsh, and should not be extended beyond its reasonable limits. Bradley Lumber Company of Arkansas v. Clanton, 201 Ark. 657, 660, 147 S.W.2d 14; Goodin, Adm'x v. Boyd-Sicard Coal Company, 197 Ark. 175, 180, 122 S.W.2d 548; Federal Compress & Warehouse Company v. Harmon, supra, at page 432 of 196 Ark., 118 S.W.2d 239.

Even though an employee knows of his master's negligence, nevertheless he does not assume the risk of the increased hazard unless he actually realizes the danger to which he is exposed. Federal Compress & Warehouse Company v. Harmon, supra, at page 433 of 196 Ark., 118 S.W.2d 239. In other words, an appreciation of the danger is a prerequisite to the application of the doctrine. Goodin, Adm'x v. Boyd-Sicard Coal Company, supra, at page 181 of 197 Ark., 122 S.W.2d 548.

There is some doubt as to whether the doctrine of assumption of risk applies between a general contractor and the employees of his subcontractor. However, the Arkansas Supreme Court has applied the doctrine in actions by employees of shippers against railroad companies for injuries sustained while unloading box cars, owned by said railroad companies, as a result of the unsafe condition of the box cars. The Chicago, Rock Island & Pacific Railway Company v. Sampson, 200 Ark. 906, 910, 142 S.W.2d 221; St. Louis & San Francisco Railroad Company v. Fritts, 85 Ark. 460, 108 S.W. 841. See, also, Aluminum Ore Co. v. George, supra. And, the Court is of the opinion that the Arkansas Supreme Court would likewise apply the doctrine in the case of an action by an employee of a subcontractor against the general contractor.

When the above rules of law are applied to the facts herein, the Court feels that the plaintiffs were neither guilty of contributory negligence nor assumed risk.

The defendant contends that the plaintiffs knew the work of re-blocking the racks was being performed on the eight-rack row and that plaintiffs assumed the risk of their employment after having such knowledge. However, the Court has concluded that plaintiffs did not know defendant's employees were working on the eight-rack row. (Finding of fact No. V) In making this determination, the Court considered several factors. (1) The plaintiffs each denied knowing that defendant's employees were working on the eight-rack row. (2) None of defendant's employees advised plaintiffs of the fact that work had begun on said racks. (3) In working on the ten-rack row defendant's employees had been in and out of the eight-rack row, operating the pry pole, etc., and when they began working on the eight-rack row, the plaintiffs, being busily engaged

in their own work, evidently paid little attention to defendant's employees and assumed that they were still working on the ten-rack row. It is true that the defendant introduced evidence which, if believed, would tend to show that some or all of the plaintiffs might have known the work was being done on the eight-rack row, but, when all the evidence is considered, the Court is of the opinion that plaintiffs did not know defendant's employees were working on said eight-rack row, and that defendant has failed to prove by a preponderance of the evidence that plaintiffs were guilty of contributory negligence or assumed risk.

Since plaintiffs did not know that defendant's employees were working on the eight-rack row, they did not know or appreciate the danger involved, and, of course, did not assume the risk which was unknown to them. Likewise, they were not guilty of contributory negligence.

Even if plaintiffs had known that defendant's employees were working on the eight-rack row, the doctrine of assumed risk would not prevent their recovery in this case.

In Chicago, Rock Island & Pacific Railway Company v. Lewis, 103 Ark. 99, 104, 145 S.W. 898, 900, the Court said:

"The doctrine of assumed risks is based upon voluntary exposure to a known danger * * * and can only be applied in cases where the person may reasonably elect whether or not he shall expose himself to it. The exposure may be without physical coercion, yet the circumstances may be such as would render it unreasonable for a person to exercise his election not to proceed in that way. Therefore, if it be conceded that the plaintiff, with notice of the defect in the car before he began to unload it, assumed the risk, as a matter of law, by proceeding with the work, yet such is not the state of facts in this case. If he had such notice before he commenced unloading the car, it might be deemed reasonable to hold him to

an election, either to refuse to accept the delivery of the goods from the defective car, or to take the risk himself of unloading it if he preferred to do so while it was in that condition; but it would not be fair to apply that rule after he had proceeded with his work, unconscious of the defect, and discovered it while in the midst of his work of unloading. He was not bound, under these circumstances, to cease working because of a known defect, which it cannot be said was so dangerous that a prudent man would not proceed. He was not bound to break up his task in that way and to unload the car by piecemeal; and because he proceeded, under those circumstances, to complete his task, it cannot be said that he assumed the risk. In other words, it is not reasonable to expect him, in that state of the progress of his work, to decline to proceed further, unless the danger was so obvious that it was negligence to proceed, and it therefore cannot be said that self-exposure to the danger, under those circumstances, was voluntary in the sense that he must be deemed, in law, to have accepted the risk."

In Goodin, Adm'x v. Boyd-Sicard Coal Company, supra, the Court at page 181 of 197 Ark., at page 551 of 122 S.W. 2d, quoted with approval the following statement from R. C. L.:

"Although an employee may have had knowledge as of a physical fact, of the defective condition of a tool, appliance or place, by reason of which he has sustained an injury, it by no means follows that he must have appreciated the danger to which he was exposed. His general knowledge may not have been such as to give him any conception of the peril. The condition may have appeared perfectly harmless. If this is shown to have been the case, his right of recovery is not defeated, for it is an appreciation of the danger, not mere knowledge of the de-

fect by which the danger is threatened, that bars his action."

In the instant case the plaintiffs were already painting on the eight-rack row at the time defendant's employees began working on said row. Therefore, even if plaintiffs knew that defendant's employees were working on said row, it would not be reasonable to expect them to stop their work unless the danger was so obvious that it was negligence to proceed. The Court does not believe that such danger would have been apparent to plaintiffs. They had the right to assume that defendant's employees were using a reasonably safe method of removing the rails. Moreover, if they knew work was being performed on the eight-rack row, they also knew that the work had been completed on the ten-rack row, and since the ten-rack row was still standing plaintiffs might reasonably have assumed that defendant's employees were using a safe method of removing the rails and that there was no danger of the eight-rack row falling as a result of the work.

The defendant's foreman in charge of the crew that was removing the rails was the same foreman who set the racks on the rails for painting in November, 1952, and, of course, he realized the danger involved in handling the racks since he was advised of their weight and construction and of the necessity of keeping them on a level and solid foundation with proper braces to prevent them from falling. The plaintiffs, on the other hand, were painters and were busily engaged in their work. They had no experience in the placing or handling of such racks and were not present when the racks were placed in position in November, 1952, by defendant's employees. Therefore, plaintiffs would have been justified in believing that defendant's employees were using a reasonably safe method of removing the rails and that there was no danger of the racks being overturned or caused to fall because of the activities of defendant's employees.

Therefore, even if plaintiffs knew of the work being done on the eight-rack row, they were not guilty of assumed risk or contributory negligence, and, since defendant was guilty of negligence which was the proximate cause of the injuries to plaintiffs, they are entitled to recover damages therefor.

The rule of damages applicable to personal injuries is stated in Coca-Cola Bottling Co. of Arkansas v. Adcox, 189 Ark. 610, 613, 74 S.W.2d 771, 772, as follows:

"The measure of damages for a physical injury to the person may be broadly stated to be such sum, so far as it is susceptible of estimate in money, as will compensate plaintiff for all losses, subject to the limitations imposed by the doctrines of natural and proximate consequences, and of certainty, which he has sustained by reason of the injury, including compensation for his pain and suffering, for his loss of time, for medical attendance and support during the period of his disablement, and for such permanent injury and continuing disability as he had sustained. Plaintiff is not limited in his recovery to specific pecuniary losses as to which there is direct proof, and it is obvious that certain of the results of a personal injury are unsusceptible of pecuniary admeasurement".

See also, Hot Springs Street Railway Company v. Hill, 198 Ark. 319, 128 S.W.2d 369; St. Louis-San Francisco Railway Co. v. Herndon, 198 Ark. 465, 129 S.W.2d 954.

## Conclusions of Law

### I.

The Court has jurisdiction of the parties to and the subject matter of these three causes of action.

### II.

The defendant, acting through his employees, was guilty of negligence which

was the proximate cause of the injuries received by the plaintiffs.

### III.

The plaintiffs were not guilty of contributory negligence or assumed risk.

### IV.

In Civil Action 352, the plaintiff, Virgil G. Carroll, is entitled to recover of and from the defendant, M. Lanza, d/b/a Lake Charles Electric Company, the sum of $18,000. The plaintiffs and intervenors, Harry B. Hogan, d/b/a Harry B. Hogan Painting Company, and Saint Paul-Mercury Indemnity Company, are entitled to a first lien upon two thirds of the net proceeds recovered herein that remain after the payment of the reasonable costs of collection, for the payment to them of the amount paid and to be paid by them as compensation to the plaintiff, Virgil G. Carroll.

### V.

In Civil Action 353, O. E. Jennings, as next friend of the plaintiff, Paul A. Jennings, is entitled to recover of and from the defendant, M. Lanza, d/b/a Lake Charles Electric Company, the sum of $6,000, for the use and benefit of the said plaintiff, Paul A. Jennings, a minor. The plaintiffs and intervenors, Harry B. Hogan, d/b/a Harry B. Hogan Painting Company, and Saint Paul-Mercury Indemnity Company, are entitled to a first lien upon two thirds of the net proceeds recovered herein that remain after the payment of the reasonable costs of collection, for the payment to them of the amount paid and to be paid by them as compensation to the plaintiff, Paul A. Jennings.

### VI.

In Civil Action 356, the plaintiffs, Saint Paul-Mercury Indemnity Company, Harry B. Hogan, d/b/a Harry B. Hogan Painting Company, and Lonnie Sisney, are entitled to recover of and from the defendant, M. Lanza, d/b/a Lake Charles Electric Company, the sum of $22,500. As between the various plaintiffs, the plaintiff, Lonnie Sisney, is entitled to any amount recovered herein over and above the amount that the plaintiffs, Harry B. Hogan and Saint Paul-Mercury Indemnity Company, have paid or are liable for in compensation, after deducting reasonable costs of collection, and in no event shall the plaintiff, Lonnie Sisney, be entitled to less than one-third of the amount herein recovered, after deducting the reasonable cost of collection.

A judgment in accordance with the above should be entered.